1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CAROLE MIGDEN, et al.,

11              Plaintiffs,                    No. CIV S-08-0486 EFB

12        vs.

13   CALIFORNIA FAIR POLITICAL              ORDER ON MOTION FOR A
     PRACTICES COMMITTEE, et al.,          PRELIMINARY INJUNCTION

14              Defendants.

15   _____/

16        This case was before the court on April 1, 2008, for hearing on plaintiffs' motion for a

17   preliminary injunction pursuant to Fed. R. Civ. P. 65(a).[1] James C. Harrison and Karen Getman

18   appeared as plaintiffs' counsel and Lawrence T. Woodlock and Kourtney Vaccaro appeared as

19   defense counsel.  For the reasons stated on the record at the hearing and as set forth below,

20   plaintiffs' motion for a preliminary injunction is granted.

21   **I.  JURISDICTION**

22        Plaintiffs – Carole Migden, the Friends of Carole Migden Committee, and the Re-elect

23   Senator Carole Migden Committee (referred to collectively as "plaintiffs") – allege violations of

24   their constitutional rights under the First and Fourteenth Amendments.  They assert three causes

25   ───────────────────

26        [1]  The parties have consented to proceed before this court pursuant to 28 U.S.C.
     § 636(c)(1).

1

of action against the defendants, the California Fair Political Practices Commission ("FPPC"), Ross Johnson, in his official capacity as Chairman of the FPPC, and Timothy A Hodson, A. Eugene Huguenin, Jr., Robert Leidigh, and Ray Remy, in their official capacities as members of the FPPC (collectively referred to as "FPPC").  The first cause of action asserts that § 89519 of the California Government Code is facially invalid under the First and Fourteenth Amendments to the U.S. Constitution because it prohibits candidates from expending campaign funds on campaign activities.  The second cause of action asserts that California Government Code § 89519 is unconstitutional as applied to plaintiffs because it prohibits them from spending campaign funds on their current campaign activities.  The third cause of action asserts that the FPPC's enforcement of this provision is done under color of state law and deprives them of their constitutional rights in violation of 42 U.S.C. § 1983.  This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

## II. BACKGROUND

Senator Carole Migden is currently running for re-election to the Third Senate District in California.[2]  Declaration of Carole Migden in Support of Plaintiffs' Motion for Preliminary Injunction ("Migden Decl."), ¶ 1.  Migden, a democrat, faces challenges from two well-known candidates in the upcoming June 2008 democratic primary election.  *Id.*, ¶¶ 1, 7.[3]  Because the district is heavily democratic, the primary is likely to be the determinative election in the election cycle.  *See* Declaration of Richard Ross in Support of Plaintiffs' Motion for Preliminary Injunction ("Ross Decl."), ¶ 4.  The election is in June and absentee voting begins in May.  *Id.*, ¶ 6.  Plaintiffs have submitted evidence showing that approximately forty-nine percent of the electorate votes by absentee ballot.  *Id.*, ¶ 4.

---

[2]  The Third Senate District encompasses Marin County and parts of the City and County of San Francisco and Sonoma County.  Senator Migden's current term of office ends December 2008.  Migden Decl., ¶ 1.

[3]  At the time plaintiffs' complaint was filed, she faced competition from three challengers.  One, Joe Alioto Veronese, has since withdrawn from the race.

In her efforts to seek re-election, Senator Migden wishes to use specific campaign funds that she has left over from earlier campaigns to purchase air time on radio and television, to distribute campaign mailers, and to fund campaign events and get-out-the vote activities. Migden Decl., ¶ 7; *see also* Ross Decl., ¶¶ 6-10.  She has been instructed by the defendants that she may not do so for reasons discussed below.  Those disputed funds and their permissible use are the subject of this preliminary injunction motion.

The FPPC is a state agency created by the Political Reform Act of 1974 ("PRA"). California Government Code ("Cal. Gov't Code") §§ 81000, *et seq*.  It is responsible for administering and implementing the PRA.  Cal. Gov't Code § 83111.  The FPPC has instructed Senator Migden that the disputed funds in this case have become "surplus" within the meaning of Cal. Gov't Code § 89519, and thus may not be used in her current re-election campaign. Declaration of James B. Harrison in Support of Plaintiffs' Motion for Preliminary Injunction ("Harrison Decl."), Ex. A.

**A.  Surplus Funds**

Section 89519 is a "surplus funds statute."  It requires candidates for elective office to disclose surplus campaign funds upon leaving elected office.[4]  Pursuant to the statute, funds

---

[4]  Section 89519 provides in relevant part:

> (a) Upon leaving any elected office, or at the end of the post-election reporting period following the defeat of a candidate for elective office, whichever occurs last, campaign funds raised after January 1, 1989, under the control of the former candidate or elected officer shall be considered surplus campaign funds and shall be disclosed pursuant to Chapter 4 (commencing with Section 84100).

> (b) Surplus campaign funds shall be used only for the following purposes:

> (5) Contributions to support or oppose any candidate for federal office, any candidate for elective office in *a state other than California*, or any ballot measure. (emphasis added).

become "surplus" when a successful candidate leaves the term of office for which she was

elected, or at the end of the first reporting period following a candidate's defeat.  It provides

specifically articulated purposes for which surplus funds may be used, including for example, the

payment of outstanding campaign debts, repayment of contributions, and donations to bona fide

charitable, educational, civic, religious or other nonprofit organizations.  Cal. Gov't Code

§ 89519(b).

Subdivision 89519(b)(5) prohibits surplus funds from being used to support or oppose a

candidate in a state election.  Nonetheless, pursuant to Cal. Code Regs. tit. 2, § 18951(a)(1), an

incumbent state candidate may use surplus funds for a future election, but only if she transfers

them to a new committee for a future election no later than the date on which she leaves the

elective office for which the funds were raised.  Cal. Code Regs. tit. 2, § 18951(a)(1).[5]  Thus, if a

candidate fails to transfer the unspent funds by the date on which she leaves office, the funds

become "surplus" and may only be used for the purposes specified in the statute.

This "deadline" on the transfer of campaign funds to a committee for a future election is

what is at issue in this case.  Here, Senator Migden admittedly missed the deadline.  However,

plaintiffs argue that this deadline is arbitrary and its effect is to foreclose a candidate's otherwise

allowable expenditure of campaign funds.

---

Cal. Gov't Code § 89519.

[5]  Cal. Code Regs. tit. 2, § 18951(a)(1) provides:

> Campaign funds raised after January 1, 1989, under the control of
> a candidate or elected officer shall be considered surplus campaign
> funds on the following dates:
>
> (1) Incumbent Candidates: The date on which an incumbent
> candidate leaves any elective office for which the campaign funds
> were raised, or, if the candidate is defeated for reelection, the end
> of the postelection reporting period following his or her defeat,
> whichever is later. An incumbent candidate who wishes to use
> funds for a future election must transfer those funds to a new
> committee for a future election no later than this date.

**B.  Pre-Proposition 34 Funds**

Not incidentally, the funds that Senator Migden wishes to spend in this case are "pre-Proposition 34 funds."  Proposition 34, passed into law and made effective on January 1, 2001, imposed limits on contributions to state candidates by persons other than small contributors or political party committees in elections on or after January 1, 2001.  Cal. Gov't Code § 85301.

Funds raised prior to January 1, 2001 (i.e., prior to the effective date of Proposition 34), may be used for future election campaigns without regard to the contribution limits imposed under Proposition 34.  Cal. Gov't Code § 85306.  Section 85306 authorizes a candidate to transfer campaign funds "from one controlled committee to a controlled committee for elective state office of the same candidate."[6]  Cal. Gov't Code § 85306(a).  Subdivision (b) of 85306 provides that a "candidate for statewide elective office, who possesses campaign funds on January 1, 2001, may use those funds to seek elective office without attributing the funds to specific contributors."  Cal. Gov't Code § 85306(b).

**C.  Conversion of "Pre-Proposition 34 Funds" to "Surplus Funds"**

There is no limit on the number of times a candidate can transfer pre-Proposition 34 funds to another campaign committee established by the same candidate for a future election. Cal. Code Regs. tit. 2, § 18530.2.  Further, section 85306 imposes no deadline on making these transfers.

However, reading § 85306 together with § 89519 and Cal. Code Regs. tit. 2, § 18951(a)(1), it becomes apparent that "pre-Proposition 34" funds can become "surplus funds" if they are not transferred to the candidate's new campaign committee before her last day in the office for which the funds were raised.

---

[6] "Controlled committee" is defined as "a committee that is controlled directly or indirectly by a candidate or state measure proponent or that acts jointly with a candidate, controlled Committee, or state measure proponent in connection with the making of expenditures.  A candidate or state measure proponent controls a committee if he or she, his or her agent, or any other committee he or she controls has a significant influence on the actions or decisions of the committee."  Cal. Gov't Code § 82016(a).

1       This is precisely the situation encountered in this case.  Prior to becoming a state senator,

2  Migden represented San Francisco in the State Assembly from 1996 through 2002, then served

3  on the Board of Equalization ("BOE") from 2002 through 2004.

4       At the end of December 2000, Migden's "Assembly Committee" had approximately

5  $900,000 in unspent funds from her successful 1998 and 2000 campaigns for re-election to the

6  State Assembly.  These were "pre-Proposition 34 funds" raised prior to January 1, 2001.

7  Declaration of Roger Sanders in Support of Plaintiffs' Motion for Preliminary Injunction

8  ("Sanders Decl."), ¶¶ 1-3; Migden Decl., ¶¶ 1-2.

9       Plaintiffs allege that in December 2000, just one month after voters passed Proposition

10  34, it was unclear how to segregate unspent funds in order to comply with the new law.  Even

11  though Migden had filed a statement of organization in December 2000 to open a committee to

12  run in 2004 for state senate (the "2004 Committee"), and a statement of organization to run for

13  the BOE in 2002, using a committee named "Carole Migden Leadership Committee" ("BOE

14  Committee"), her treasurer, Roger Sanders, did not want to move the pre-Proposition 34 funds to

15  either of these accounts until the FPPC decided whether the money could be transferred only

16  once, or if other restrictions applied.  Sanders Decl., ¶ 5.

17       Despite this confusion, Migden did know that these pre-Proposition 34 funds would be

18  valuable if she faced a contested election in the future.  Migden Decl., ¶ 2; Sanders Decl., ¶¶ 4-5.

19  Accordingly, in early 2001, Migden instructed Sanders to ensure that the unspent funds

20  remaining in the 2000 Assembly Committee as of December 2000, were preserved for future

21  campaigns.  Migden Decl., ¶ 2.  To that end, he transferred the $900,000 from the Assembly

22  Committee's checking account to a separate certificate of deposit account at Wells Fargo Bank.

23  Sanders Decl., ¶ 6.  Sanders used the tax identification number assigned to the 2004 Committee.

24  That same tax identification number was used for the Assembly Committee and for the BOE

25  Committee.  *Id.*  Sanders claims this was the instruction he received from the IRS.  *Id.*  However,

26  he avers that the bank erroneously continued to associate the tax identification number with the

name of the first committee to use it, i.e., the Assembly Committee.  *Id.*

The Wells Fargo CD matured in March 2002, at which time Senator Migden was actively seeking election to the BOE.  Migden left her Assembly seat in December 2002, and did not need or use the pre-Proposition 34 funds for the BOE election because the democratic primary for that seat was uncontested.  Migden Decl., ¶¶ 3, 4; Sanders Decl., ¶ 8.

When the Wells Fargo CD matured in 2002, the pre-Proposition 34 funds were moved to an interest-bearing account at Sterling Bank.  Sanders Decl., ¶ 8.  Again, Sanders used the taxpayer identification number for the 2004 Committee, but the bank put the Assembly Committee name on the account.

Plaintiffs assert that for purposes of public disclosure, they initially continued to report the pre-Proposition 34 funds on the Assembly Committee campaign reports, although they did not intend to use them in any way for that committee.  Beginning in 2003, plaintiffs reported the pre-Proposition 34 funds on the campaign reports filed in connection with the 2004 Committee so the public could keep track of the funds while Migden held that office.  Migden Decl., ¶¶ 2, 3; Sanders Decl., ¶¶ 6, 7.

Migden successfully ran for State Senate in 2004.  Migden Decl., ¶ 3.  However, she avers that she did not spend any of the pre-Proposition 34 funds on her 2004 election and that the money remained in the separate interest-bearing Sterling account until 2006.  *Id.*

In October 2006, Senator Migden transferred around $350,000 of the pre-Proposition 34 funds from the Sterling account to her Senate 2008 Committee checking account.  Migden Decl., ¶ 4.  Plaintiff avers that she was unaware that the FPPC would consider those funds "surplus" within the meaning of § 89519.  *Id.*

In the spring of 2007, Migden transferred the remaining balance of the pre-Proposition 34 funds from the separate interest-bearing account to her regular "2004 Committee" checking account."  *Id.*, ¶ 5.  As of March 2008, the balance of the pre-Proposition 34 funds in Migden's 2004 Committee account was $647,000.  *Id.*  Migden avers that she intended to transfer those

pre-Proposition 34 funds to her Senate 2008 Committee on an as needed basis.

On October 27, 2007, the FPPC's Enforcement Division informed Senator Migden that she could not transfer the pre-Proposition 34 funds to her 2008 Committee for use in the June primary because, in its view, those funds became "surplus" as of December 2002, when she left her Assembly office.[7] *See* Harrison Decl., Ex. A.  The letter also outlined procedural steps that plaintiffs would have to take in order to petition the FPPC for permission to use of the funds.  *Id.*

Since that time, Senator Migden has been attempting to convince the FPPC to allow her to use the funds.  Harrison Decl., ¶ 3.  On February 15, 2008, the FPPC informed plaintiffs that their proposed settlement of the dispute was unacceptable, and that plaintiffs could not spend the pre-Proposition 34 funds.  *Id.*  Plaintiffs initiated this action on March 3, 2008.

**D.  Defendants' Counterclaim**

The FPPC filed a counterclaim on March 28, 2008, naming as counterdefendants Senator Carole Migden in her capacity as candidate and treasurer, Roger Sanders, individually and in his capacity as committee treasurer, and four candidate-controlled committees: (1) Friends of Carole Migden, (2) Re-elect Senator Carole Migden, (3) Re-elect Assemblywoman Carole Migden 1998, and (4) Carole Migden Leadership Committee.[8]

The counterclaim alleges three causes of action, all relating to alleged violations of the PRA by Migden, her treasurer, and her committees.  Specifically, the FPPC alleges that counterdefendants violated §§ 89519 and 89521 by making unlawful transfers of surplus funds from various accounts to Migden's 2004 and 2008 Senate Committee accounts.  The FPPC also

---

[7] According to Secretary of State records, Migden filed a statement terminating her 2000 Assembly Committee in June 2003.  Declaration of Carla Wardlow in Opposition to Motion for Preliminary Injunction, ¶ 10.

[8] Roger Sanders has served as the treasurer of most of these campaign committees: (1) the "Friends of Carole Migden" committee, which was established on December 18, 2000, for Migden's 2004 election to the state senate (the "2004 Committee"); (2) the "Re-elect Assemblywoman Carole Migden" committee, established for Migden's 1998 and 2000 Assembly elections; and, (3) the Carole Migden Leadership Committee, established for Migden's 2002 election to the BOE.  Sanders Decl., ¶ 1.

alleges that Migden violated Cal. Gov't Code § 84211 by failing to make several required campaign disclosures. Finally, the FPPC alleges that counterdefendants violated Cal. Gov't Code § 85201 by having more than the allowable "one campaign bank account" and "one controlled committee" for each specific election.

Other than the claims alleging violations of § 89519, the FPPC's counterclaims have no apparent relation to plaintiffs' First Amendment claims. The FPPC has alluded to serious questions regarding plaintiffs' alleged violations of these provisions, and asks the court to deny the motion for preliminary injunctive relief and instead decide plaintiffs' claims together with the FPPC's counterclaims on expedited motions for summary judgment. While the court acknowledges the possibility that the FPPC may prevail on some or all of its claims at a later stage in the proceedings, there is no basis to delay ruling on plaintiffs' motion for preliminary injunctive relief in light of the serious constitutional questions raised and the potential for irreparable harm absent an injunction.

### III. PRELIMINARY INJUNCTION STANDARD

The legal principles applicable to a request for preliminary injunctive relief are well established. "To obtain a preliminary injunction, the moving party must demonstrate either (1) probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships sharply favors the moving party. These are not separate tests, but are the ends of a continuum; the greater the relative hardship to the moving party, the less probability of success must be shown." *Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1369 (9th Cir. 1984) (citations omitted).

////

////

////

////

////

**IV. DISCUSSION**

While plaintiffs bring both facial and as applied challenges to § 89519, the court's decision to grant plaintiffs' motion turns solely on the as applied challenge.[9]

Plaintiffs allege that the FPPC's position with regard to § 89519 in this case works as an impermissible limitation on political speech, i.e., a campaign expenditure limit that cannot pass constitutional muster.  It is beyond dispute that the restrictions being imposed here limit activity specifically protected by the First Amendment and must be justified under the relevant standard of review.  "[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."  *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976).  As discussed below, the court finds that on the "injunctive relief continuum" plaintiffs have--at a minimum--raised serious questions as to the constitutionality of § 89519 in the manner applied here that prohibits plaintiffs from expending Senator Migden's left over campaign funds on her current campaign.  Moreover, as discussed below, the balance of relative hardships tips decidedly in plaintiffs' favor.

**A.  Appropriate Standard for Reviewing Plaintiffs' Challenge**

The starting point for analysis of a constitutional attack on the application of a statute is the relevant standard of review.  Thus, the court must determine which level of scrutiny applies to plaintiffs' First Amendment challenges to Cal. Gov't Code § 89519.  The Supreme Court in *Buckley* explained that in First Amendment challenges to restrictions involving campaign financing and expenditures it is important to distinguish between restrictions on contributions, and restrictions on expenditures.  The latter, the Court explained, have a direct effect on a candidate's ability to communicate political speech to the electorate and invoke the core concerns for First Amendment protected expression.  *Buckley* 424 U.S. at 24.  For this reason,

---

[9]  Not only is the "as applied" challenge the one most strenuously argued by plaintiffs, it is dispositive of this motion.  *See FEC v. Wisconsin Right to Life*, __ U.S. __, 127 S. Ct. 2652, 2671 (2007) (a "court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech") (emphasis added).

such restrictions trigger the application of strict scrutiny.  *Id.* at 25-29; *FEC v. Wisconsin Right to Life,* __ U.S. at __, 127 S. Ct. at 2664.  Limitations on contributions, however, have less direct and less substantial effects on communication.  "[U]nlike restrictions on campaign expenditures, contribution limits 'entail only a marginal restriction upon the contributors' ability to engage in free communication.'"  *McConnell v. FEC*, 540 U.S. 93, 134-35 (2003) (quoting *Buckley,* 424 U.S. 20-21).  For that reason, they are subject to a less stringent level of scrutiny referred to herein as the "closely drawn" standard.  *Buckley,* 424 U.S. at 20.  While both standards are more exacting than rational basis review, and each requires important governmental interests and a means for achieving those interests that minimizes suppression of speech and expression to justify the infringement, strict scrutiny is the most stringent of the standards.

Defendants argue that § 89519 should only be subjected to the "closely drawn" or middle level of scrutiny applied to campaign contributions, as set forth in *Buckley* and *McConnell*. Closely drawn scrutiny requires the court to determine whether the restriction is "closely drawn to avoid unnecessary abridgement" of First Amendment freedoms.  *Buckley*, 424 U.S. at 25-29; *McConnell*, 540 U.S. at 136.  Under this standard, "even significant interference with associational rights" will be found "valid if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *Id.* (citations and quotations omitted).

Although it is not entirely clear why the FPPC believes this less exacting standard applies, they appear to argue that a "personal use" statute, such as § 89519, is aimed at preventing misuse of campaign contributions and therefore is more akin to a limitation on contributions rather than a curtailment of expenditures.  They argue that § 89519 is not designed as a limitation on political speech and should not be reviewed under strict scrutiny.

In this case, however, § 89519 has the effect of reducing the quantity of plaintiffs' speech during the last crucial weeks of a contested primary election.  Plaintiffs were not simply

////

////

11

1    admonished that they could not use the funds for personal expenses,[10] they were specifically

2    instructed not to use the left over funds for the current campaign.  In *Buckley*, the Supreme Court

3    "taught that the expenditure of funds in connection with a political campaign is a matter of

4    particular First Amendment concern."  *Service Employees Int'l Union v. Fair Political Practices*

5    *Comm'n*, 721 F. Supp. 1172, 1175 (E.D. Cal. 1989) (granting plaintiffs' motion for summary

6    judgment, holding that former Cal. Gov't Code § 85306 violated the First Amendment, and

7    enjoining its enforcement).[11]

8           Expenditure limits impose "a restriction on the amount of money a person or group can

9    spend on political communication," and thus necessarily "reduce the quantity of expression by

10   restricting the number of issues discussed, the depth of their exploration, and the size of the

11   audience reached."  *Randall v. Sorrell*, 548 U.S. 230, 126 S. Ct. 2479, 2488 (2006) (quoting

12   *Buckley*, 424 U.S. at 19).  Expenditure limitations are subject to strict scrutiny and will be upheld

13   only if they are narrowly tailored to serve a compelling state interest.  *Wisconsin Right to Life,*

14   __ U.S. at __ , 127 S. Ct. at 2664.

15          Here, regardless of what § 89519 is designed to achieve, it has the effect of limiting the

16   amount of money Senator Migden can "spend on political communication."  Its purpose is

17   relevant to whether it can satisfy strict scrutiny but it is its application here, not its purpose, that

18   triggers that level of review.  It has been applied to prevent plaintiffs from spending campaign

19   funds on an ongoing election campaign.  As such, it burdens the plaintiffs' political speech and

20   the court must examine their First Amendment challenges using the strict scrutiny standard.  *See*

21   *Wisconsin Right to Life*, 127 S. Ct. at 2664 (if a regulation "burdens political speech, it is subject

22

23          [10]  Indeed, as discussed below, there in no evidence presented that plaintiffs were seeking
     to use the funds for anything other than campaign purposes.

24          [11]  Former Cal. Gov't Code § 85306 codified Proposition 73.  Former § 85306 set forth
     various contribution limits and precluded expenditure of carryover funds to support or oppose a
25   candidacy for state elective office.  In *Service Employees Int'l Union*, the provision was found
     unconstitutional because its purpose of leveling the playing field and avoiding corruption was
26   not narrowly tailored.  *See Service Employees Int'l Union*, 721 F. Supp. at 1176-78.

1  to strict scrutiny.").  However, as discussed below, even examining the statute under the less

2  exacting "closely drawn" standard, the application of the statute, as applied here, still does not

3  appear to withstand First Amendment scrutiny, at least at this preliminary injunction phase of the

4  litigation.

5      **B. Likelihood of Success**

6      Having determined that § 89519, as applied to plaintiffs, implicates First Amendment

7  issues and that strict scrutiny applies, the court examines the asserted governmental interest

8  advanced by the statute.  The FPPC bears the burden of proving that § 89519 "furthers a

9  compelling interest and is narrowly tailored to achieve that interest."  *Wisconsin Right to Life,*

10  *Inc.*, 127 S. Ct. at 2664.

11     In its opposition, the FPPC's repeated justification for the statute is to "limit[] the

12  personal use of surplus campaign funds by former candidates."  Opposition to Motion for

13  Preliminary Injunction ("Opp'n"), 15:16-23.  In support of this interest, the FPPC provides

14  several news articles detailing allegations that state politicians finance luxurious lifestyles with

15  campaign contributions.[12]  Indeed, the prevention of corruption and the appearance of corruption

16  in election campaigns has been recognized by the Supreme Court as a compelling governmental

17  interest in the context of campaign finance regulations.  However, it has been invoked only to

18  uphold contribution limits.  *Wisconsin Right to Life, Inc.*, 127 S. Ct. at 2672 (noting that while

19  the Court has long recognized the interest in preventing corruption, this interest has only been

20  invoked to uphold contribution limits) (citing *Buckley*, 424 U.S. at 45).  To be sure, preventing

21  corruption, and in particular preventing candidates from making personal use of campaign funds,

22  is both an important and a compelling state interest.  Yet defendants' application of the statute

23  here fails under the second prong of strict scrutiny, i.e., that the means to achieve that state

24
25      [12]  The several anecdotal accounts in those articles of candidates and office holders using
    campaign funds for lavish lifestyle purchases are appalling.  But no suggestion has been made
26  here that plaintiffs are attempting in any way to use these disputed funds for any purpose other
    than to pay for the current campaign.

1   interest be narrowly tailored (or closely drawn) to avoid unnecessary restrictions on the

2   candidates' communication to the voters.

3         Assuming that § 89519 is aimed at preventing corruption through limiting a candidate's

4   personal use of campaign funds, the FPPC fails to explain how that articulated interest is

5   advanced in this case.  Indeed, plaintiffs are not seeking to use the funds to purchase a Maserati

6   or a Caribbean vacation.  Rather, they are attempting to use the monies for campaign-related

7   activities such as direct mailings and radio and television advertising.  Migden Decl., ¶ 7; Ross

8   Decl., ¶¶ 5-6.  In response, the FPPC has not qualified its instruction to plaintiffs by telling them

9   they may use the funds to hold events where the candidate will make a speech, or that she may

10   purchase newspaper, television or radio advertisements to present her political message, but not

11   for personal use.  Rather, they have instructed her that she may not use the funds at all for

12   purposes of this campaign.  Indeed, it is undisputed that the FPPC here is attempting to prevent

13   plaintiffs from spending the contested funds on these very forms of political speech during the

14   2008 election.  There is little evidence that the means applied here has been narrowly tailored to

15   achieve the articulated interest without infringing on First Amendment communication.  *See,*

16   *e.g., Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 225 (1989) (finding

17   that regulations were not narrowly tailored where they did not advance the government's

18   articulated interest); *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986)

19   (same).

20         That the means applied here to achieve the state interest of prohibiting personal use is not

21   narrowly tailored to achieve that goal is underscored by the alternative tools available to the

22   FPPC.  Preventing the personal use of the funds can be accomplished without barring use of the

23   funds to engage in political speech.  Upon filing her statement of intent to run for office under

24   Cal. Gov't Code § 85200, Senator Migden was subject to the requirement that she report all

25   expenditures on this campaign under § 84211.  She is also subject to the provisions of §§ 89512

26   and 89512.5 requiring that all expenditure of funds be related to the political purposes specified

in the statute.  Similarly, she is subject to §§ 89513 through 89518 which list what the money

can, and cannot be spent on.  As the FPPC conceded at oral argument, these provision have

penalties if they are violated.  Indeed, they appear to be precisely the forms of alternatives for

addressing the state interest asserted here (no personal use) without a blanket prohibition on any

use of the funds for this campaign.

Neither can the restriction here be defended as an enforcement means necessary to

prevent circumvention of restrictions aimed at combating corruption, a justification sometimes

upheld as to campaign contribution limitations.  *See McConnell*, 540 U.S. at 143-44.[13]  The only

threatened activity by plaintiffs is to spend the money on mailings and advertising for this

campaign.  The abstract notion that maybe she will someday use the money for a corrupt purpose

cannot serve as a justification that withstands First Amendment scrutiny.  "The Government may

not suppress lawful speech as the means to suppress unlawful speech."  *Wisconsin Right to Life*,

127 S. Ct. at 2672 (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002)).

Further undermining the FPPC's position is its decision in another case to waive

§ 89519's prohibition on using surplus funds to finance a campaign for state office.  *See In re*

*Pirayou*, 19 F.P.P.C. Ops. 1 (2006); Harrison Decl., Ex. B.  In the *Pirayou* decision, the FPPC

allowed a state senator to spend surplus funds on a campaign for state office even though she

missed the deadline for making the transfer from one committee account to another.

In that case, the FPPC identified the interest advanced by § 89519 as ensuring "that

candidates do not secretly amass campaign funds to finance a future campaign.  A timely transfer

permits candidates to express their intention to use collected contributions for a future campaign

---

[13]  Even though the Supreme Court recognized in *McConnell* that a state could use
enforcement procedures necessary to prevent circumvention of restrictions aimed at combating
corruption, that finding was made in the context of campaign contributions rather than
expenditures.  *McConnell*, 540 U.S. at 143-44.  Expenditure limitations "cannot be sustained
simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution
limitations."  *Buckley*, 424 U.S. at 44.  In this case, the funds at issue are pre-Proposition 34
funds that were raised prior to the imposition of contribution limits.

1  and avails the public of information regarding the candidate's campaign strategies." *See In re*

2  *Pirayou*, 19 F.P.P.C. Ops. 1 (2006).

3         There, the FPPC applied equitable principles to allow another state senator, Ellen

4  Corbett, to use surplus funds where she relied on a staffer's representations that the funds did not

5  need to be transferred until sometime after she left office.  The FPPC found the facts of Corbett's

6  case extraordinary and "persuasive in implementing the overall provisions of the Act." *Id.*

7  Those facts may be summarized as follows: (1) the senator made repeated requests to her staff to

8  transfer the funds to the new committee; (2) the senator repeatedly articulated concerns to her

9  treasurer about transferring the funds in a timely fashion; (3) the senator was running in a highly

10  contested race and denial of access to the funds would severely harm her candidacy; (4) the

11  senator had "clean hands," i.e., no previous violations of the PRA; and, (5) returning the

12  contributions would not make her whole in the highly contested race.  That is, there was no

13  guarantee that the contributions would be returned to her in time to be spent in the highly

14  contested race, if at all.

15         At the hearing, the FPPC attempted to distinguish the *Pirayou* decision on several bases,

16  none of them material to the court's constitutional analysis here.  While Migden's actions have

17  somewhat obfuscated disclosure of the pre-Proproposition 34 funds' journey from 2000 to present,

18  it does not appear that this obfuscation was designed to divert the funds for personal or other

19  corrupt use, or, more importantly, that she must be prevented from spending those funds on this

20  campaign to prevent their expenditure on personal use.  Indeed, there is no allegation to that

21  effect in the papers presently before the court.  While plaintiffs may not have understood the

22  PRA as well as Senator Corbett did, and have admittedly paid fines for PRA violations, the

23  "extraordinary circumstances" justifying waiver of § 89519's prohibitions as to Senator Corbett

24  are otherwise similar to those faced by Senator Migden.

25         Regardless of the factual circumstances surrounding Senator Corbett's use of surplus

26  funds to campaign, the very decision shows that the statute's effective prohibition on

16

1  expenditures is not necessary to achieve the asserted governmental interests.  Not only did the

2  FPPC articulate a different interest in the *Pirayou* case than it does here, neither asserted interest

3  appears to be advanced by enforcement of the statute as applied here.

4       Again, the goal of preventing personal use of campaign contributions is not even

5  implicated in this case.  There has been no allegation by the FPPC that plaintiffs have used or

6  intend to use the pre-Proposition 34 funds for anything other than political speech.  Further, if

7  the goal is to prevent candidates from amassing war chests in order to "level the playing field,"

8  that interest cannot withstand a constitutional challenge.  *See Buckley*, 424 U.S. at 48-49 ("the

9  concept that government may restrict the speech of some elements of our society in order to

10  enhance the relative voice of others is wholly foreign to the First Amendment").  In any event,

11  that interest is belied by the very statutory scheme at issue.  Under the current regulations, a

12  candidate is explicitly permitted to carry forward "war chests," provided the transfer occurs by

13  the statutory deadline.

14       While transparency as to a candidate's intended use of contributions may be a substantial

15  governmental interest, that goal is also undermined by the current statutory scheme.  As written,

16  a candidate may use pre-Proposition 34 funds *ad infinitum*, without any attribution as to where

17  the contributions originated.  The perpetual carry-forward provisions do little to reveal whether a

18  candidate will be using the funds to run in an upcoming election, or in an election decades down

19  the road.  Further, the goal of transparency is not advanced where there is no monitoring of

20  surplus funds, nor a deadline by which such funds must be spent.  Indeed, while the FPPC argues

21  that the statute is necessary to prevent former candidates from dipping into the unmonitored

22  surplus funds for personal use, they do not demonstrate how the mere designation of funds as

23  "surplus" achieves that result.

24       Furthermore, the "punishment" for the missed deadline in this case does not fit the

25  "crime."  The FPPC does not explain why plaintiffs' alleged PRA violations should result in a

26  wholesale prohibition against otherwise lawful campaign expenditures.  Indeed, the FPPC has

17

sought, and is seeking in its counterclaim, to hold plaintiffs accountable for their alleged

disclosure and reporting violations under the PRA.  Accountability for such violations can be

achieved through less drastic means than by effectively "gagging" the candidate.

Finally, the FPPC's argument that no other surplus fund limitation has been struck down

is unavailing.[14]  A "court applying strict scrutiny must ensure that a compelling interest supports

*each application* of a statute restricting speech."  *Wisconsin Right to Life*, 127 S. Ct. at 2671

(emphasis added).  The issue here is whether § 89519 as applied to Senator Migden passes

constitutional muster.  For the reasons discussed *supra*, § 89519 cannot meet strict scrutiny

because it prohibits more speech than is necessary to achieve the articulated state interest.

Examining the effect of § 89519 under the "closely drawn" standard warrants an identical

conclusion.  Under that standard, a regulation may be sustained "only if the state demonstrates a

sufficiently important interest and employs means closely drawn to avoid unnecessary

abridgment of" First Amendment rights.  *Service Employees Int'l Union v. Fair Political*

*Practices Comm'n*, 955 F.2d 1312, 1322 (9th Cir. 1992) (internal citations omitted).  Again, the

regulation in this case is not "closely drawn" to avoid unnecessary abridgement of plaintiffs'

First Amendment rights.  It has the effect of completely foreclosing speech that is otherwise

permitted, and does virtually nothing in this instance to advance the State's articulated interest in

preventing a candidate's personal use of contributions.

////

////

////

////

---

[14]  The Alaska Supreme Court upheld a statute that limited the amount of a money a
candidate could carry over to use in an election for a different office.  However, the opinion's
discussion offers no analysis as to how the statute at issue was narrowly tailored to achieve the
governmental interest in avoiding otherwise legal campaign contribution limits.  *State v. Alaska
Civil Liberties Union*, 978 P.2d 597, 631-32 (Alaska 1999) (upholding a limitation on intra-
candidate transfers from one election to the next).

For the reasons stated above, under either standard of First Amendment review, plaintiffs have demonstrated a likelihood of success on their as applied First Amendment challenge to Cal. Gov't Code § 89519.[15]

### C.  Irreparable Harm and Balance of Relative Hardships

In weighing the relative hardships, the court weighs competing claims of irreparable harm.  The court must weigh the harm plaintiffs face if injunctive relief is denied against the harm that defendants will face if they are enjoined.  Without question, enjoining a state agency from enforcing a statute in a given case causes a generalized, but nonetheless significant harm to the state.  As a general matter, any time a state is enjoined from effectuating its statutes, it suffers a form of irreparable injury.  *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (granting stay of injunction and noting "that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").  Thus, the hardship to the FPPC from an injunction against enforcing § 89519 in this instance must be considered and weighed.  Yet, there are compelling countervailing concerns.

"'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

> [T]he fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [plaintiffs'] favor.  Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by

---

[15]  This court is not the first entity to arrive at this conclusion.  Plaintiffs cite an opinion from 1995 by California's Attorney General.  *See* 78 Ops. Cal. Att'y Gen. 266 (Aug. 9, 1995).  In that opinion, the Attorney General issued an opinion letter concluding that an Assemblymember could use campaign funds raised for state legislative office to campaign for election to the office of county supervisor.  However, he found that the candidate could not use surplus funds under the FPPC's regulatory scheme, even though this restriction was most likely an unconstitutional ban on an officeholders's quantity of political expression.  *Id.*

1
2
3
4

> demonstrating the existence of a colorable First Amendment claim.
> Because the test for granting a preliminary injunction is a
> continuum in which the required showing of harm varies inversely
> with the required showing of meritoriousness, when the harmed
> claimed is a serious infringement on core expressive freedoms, a
> plaintiff is entitled to an injunction even on a lesser showing of
> meritoriousness.

5   *Sammartano*, 303 F.3d at 973-74 (reversing denial of preliminary injunction to a motorcycle

6   organization that challenged courthouse rules prohibiting biker organization attire) (internal

7   citations and quotations omitted); *see also S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148

8   (9th Cir. 1998) (demonstration of probable success on the merits of a First Amendment claim

9   also demonstrated the possibility of irreparable harm, because the loss of First Amendment

10  freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury).

11      While the First Amendment concerns, themselves, tip the balance, the absence of any

12  practical and particularized harm to the State in this instance tips the balance more sharply.  At

13  oral argument, the FPPC candidly acknowledged that apart from the generalized harm anytime a

14  state agency is enjoined from enforcing a statute, the FPPC is unable to identify any practical

15  harm from the specific injunction sought here that would tip the scales in its favor.  Here, the

16  effect of this injunction results in little more than allowing speech that would otherwise be

17  occurring if plaintiffs had not missed the transfer deadline.

18      The balance is tipped decidedly in plaintiffs' favor when the very imminent and palpable

19  harm plaintiffs face is added to the balance.  The irreparable harm facing plaintiffs is illustrated

20  by the imminent nature of the June 2008 primary, and the limited time they have to communicate

21  with voters before absentee balloting begins in May.  If they are not allowed to spend their

22  campaign money on campaign speech over the next few weeks, that diminishment in the quantity

23  of speech could indeed result in their loss of the primary.  *See* Ross Decl., ¶¶ 6-11.  No remedy

24  could make plaintiffs "whole" if they are denied the opportunity to use their funds to

25  communicate to voters during this crucial period of the campaign.

26  ////

1   The FPPC counters that the court should decline to grant plaintiffs any relief until it can

2   consider more evidence and rule on the claims of the complaint and counterclaim on expedited

3   motions for summary judgment.  They seem to allude that if they prevail on their counterclaims,

4   plaintiffs' First Amendment concerns would be eliminated.  However, the FPPC fails to explain

5   how this is so, or how violations of the PRA are properly remedied by prohibiting otherwise

6   allowable speech.  Whether or not Migden violated provisions of the PRA should have no

7   bearing on whether § 89519 is effectively restricting her constitutional rights.

8   **D.  Bond**

9   Rule 65(c) permits a court to "issue a preliminary injunction only if the movant gives

10  security in an amount that the court considers proper to pay the costs and damages sustained by

11  any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

12  The Ninth Circuit has recognized that Rule 65(c) invests the district court "with

13  discretion as to the amount of security required, if any."  *Jorgensen v. Cassiday*, 320 F.3d 906,

14  919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

15  "The district court may dispense with the filing of a bond when it concludes there is no realistic

16  likelihood of harm to the defendant from enjoining his or her conduct."  *Id.*

17  Because the relief sought is a matter of "constitutional significance," and there is no

18  showing that an injunction will cause harm to defendants in any way addressable by a bond or

19  other financial undertaking, the court waives the bond requirement.  *See Baca v. Moreno Valley*

20  *Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996); *Doctor John's, Inc. v. City of Sioux*

21  *City*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004).  As discussed above, the practical

22  "harm" alleged by defendants is slight compared with the very real and pragmatic irreparable

23  injury faced by plaintiffs.  Plaintiffs have demonstrated sufficient merit to their First Amendment

24  claims at this early phase of the litigation, and there is no realistic, tangible harm to defendants

25  from enjoining the enforcement of § 89519 under the facts of this case.

26  ////

21

Finally, for the same reasons set forth above, the defendants' motion for a stay pending appeal is denied.

**V.  CONCLUSION**

In accordance with the foregoing, plaintiffs' motion for a preliminary injunction is granted as follows:

1.  Defendants, their officers, agents, servants, employees, and persons acting under their direction shall not enforce Cal. Gov't Code § 89519 against plaintiffs, and shall not take or require any other action that would prevent plaintiffs from spending the approximately $647,000 currently in the 2004 Committee account on campaign activities in connection with the 2008 election.

2.  This preliminary injunction shall take effect immediately and shall remain in effect until otherwise ordered by this court, or until final judgment is entered in this case.

3.  The bond is waived.

4.  For the reasons stated on the record and at the hearing, the FPPC's motion for a stay pending appeal is denied.

5.  Within fifteen days from the date this order, the parties shall submit status reports addressing the subjects set forth in Local Rule 16-240(a) and (b).  Those reports shall address whether full scheduling of this is warranted or whether it is likely to be resolved on cross-motions for summary judgment.  After submission of the status reports, the court will schedule a status conference if it determines one is necessary.

SO ORDERED.

DATED:  April 3, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE